# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## ON MOTION FOR REHEARING

## NO.  03-23-00252-CR

**Abel Abraham Rueda, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE 340TH DISTRICT COURT OF TOM GREEN COUNTY
### NO. C-20-1105-SB, THE HONORABLE JAY K. WEATHERBY, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

We withdraw our previous opinion and judgment issued on August 28, 2024, and substitute the following opinion and judgment in their place.  We deny Abel Abraham Rueda's motion for rehearing.

Rueda was convicted of murdering Juan Victorio Quintana and was sentenced to life imprisonment.  *See* Tex. Penal Code §§ 12.32, 19.02.  On appeal, Rueda argues that the trial court erred by denying his motion to suppress a recording of his interview by the police.  We will affirm the trial court's judgment of conviction.

## BACKGROUND

On October 24, 2020, around 5:30 a.m., a woman walked out of her house in San Angelo, Texas, in Tom Green County. On the way to her car, she saw a car parked on the roadway in front of her house and then heard a gunshot and saw sparks from the discharge. After observing the gunshot, the woman went back inside her home, called 911, and later talked with the police when they responded to the call.

When the police arrived, they found a deceased man in the woman's yard, and the police later identified the man as Quintana. An autopsy performed on Quintana two days later revealed that Quintana died from a shotgun wound fired at his chest from two to three feet away. The shotgun shrapnel severed Quintana's heart in half and travelled through his lungs and stomach, resulting in massive blood loss.

While examining the scene, the officers noticed a bag filled with breakfast tacos from a nearby convenience store. After reviewing surveillance footage from the convenience store, obtaining a warrant for the credit card transactions conducted at the store shortly before the shooting, and reviewing surveillance footage from other locations for the hours leading up to the shooting, the police identified Rueda as a suspect in the case. Once the San Angelo police officers obtained an arrest warrant for Rueda, they discovered that he was being held in jail in Big Spring, Texas, in Howard County on another charge. While in jail in Big Spring, Rueda was interviewed by police officers from Big Spring and later by police officers from San Angelo.

Before trial, Rueda filed a motion to suppress the following recordings of interviews conducted while he was in jail in Big Spring: two interviews with police officers from Big Spring and two interviews with police officers from San Angelo. The first recording was from November 12, 2020. The interview was approximately eleven minutes long and was conducted

by police officers from Big Spring in an interrogation room. Rueda was wearing jail attire, but he was not shackled. On the recording, one of the officers read Rueda his *Miranda* and article 38.22 rights, and Rueda placed his initials next to each right listed on the card and signed the portion of the document stating that he was waiving his rights. After Rueda signed the document, one of the officers questioned him about an aggravated robbery for which Rueda had been arrested. During the interview, Rueda denied doing anything wrong, and the officer eventually started yelling. Rueda asked for a lawyer approximately seven minutes after signing the waiver document and then repeated the request two more times. The police officers terminated the interview approximately one minute after Rueda first said that he wanted a lawyer.

The second recording was from November 17, 2020, and was one hour and twenty minutes long. The interview was conducted in an interrogation room by one of the Big Spring police officers from the first interview. As with the first interview, Rueda was wearing jail clothes but was not shackled. On the recording, Rueda explained that he asked to talk with the officer because he wanted to talk about several things, including his having learned that he had been charged with a murder that he claimed he did not know anything about. Rueda asked the officer if the officer would reach out to the police in San Angelo and tell them that he wanted to talk about the murder charge, and the officer agreed to contact the San Angelo Police Department. The officer and Rueda then discussed the aggravated-robbery case and the evidence the police had obtained. When Rueda referenced the San Angelo murder charge again, the officer informed Rueda that his "best bet" was to obtain a lawyer for that case. After Rueda said that he did not have any money to hire a lawyer, the officer pulled out the *Miranda* card that Rueda had signed a few days earlier, pointed to the portion about appointed attorneys, and reminded Rueda that he

3

could have an attorney appointed if he requested one. The officer ended the interview to do other duties, and Rueda expressed the desire to talk with the officer again.

The third recording was from November 18, 2020, and was conducted by two officers from the San Angelo Police Department in an interrogation room in Big Spring. The interview is approximately two hours and twenty minutes long. Like the previous two interviews, Rueda wore jail clothing but was not shackled. On the recording, one of the officers explained that they were there because they had been told that Rueda wanted to talk to them. The officer then explained that he would be reading Rueda his rights, and Rueda explained that he had been read his rights in other cases. When the officer read each right, Rueda stated that he understood each right. The officer informed Rueda that he had the right to an appointed attorney if he could not afford to hire an attorney, and Rueda asked how long that would take. The officer explained that an attorney would be appointed by a court. Rueda stated that he had not been given an appointed attorney yet. The officer also explained that because Rueda was facing charges in Howard County and Tom Green County, he would have to go through the procedure for obtaining an appointed attorney in each county and could begin the procedure for the Tom Green County charges when he was transferred to a jail in that county. The officer then reminded Rueda that if he wanted to seek legal counsel, he did not have to talk with the officers. Rueda informed the officers that he would like to continue the interview. The officer then continued reading Rueda his rights, and Rueda stated that he understood that he had the right to terminate the interview at any time. After referencing the rights, the officer asked if Rueda wanted to talk with the officers, and Rueda said that he did. The officer instructed Rueda to place his initials next to each right on the form listing his rights to show that he understood the rights and then showed Rueda where to sign if he wanted to waive the rights. Rueda initialed and signed the form.

Next, Rueda discussed how he had been dating someone named Wendy McCluskey and how McCluskey had issues with two other men with whom she had been involved, including Quintana who was recently shot. However, Rueda denied having any interaction with Quintana and claimed not to know him. After further discussion and the officer's asking when Rueda last saw Quintana, Rueda stated that he wanted a lawyer because the police were now talking about a murder. The officer said "okay" in response but then asked Rueda about his association with Quintana. Rueda denied having any issue with Quintana. The officer told Rueda that he had planned to show Rueda the information that they had but then Rueda asked for an attorney. Rueda told the officer twice that they could continue with the interview because he had changed his mind about wanting an attorney. The officer informed Rueda that a witness identified Rueda and McCluskey and recognized his vehicle. Soon thereafter, the audio portion of the recording becomes garbled for the next hour of the interview.

The final recording was from November 23, 2020, and was one hour and fifteen minutes in length. The interview was held in an interrogation room in Big Spring, and Rueda was handcuffed and wore a jail-issued garment that was thick and padded and covered his chest and legs. At the beginning of the recording, one of the San Angelo police officers stated to Rueda that he heard that Rueda wanted to talk to the police again. Rueda responded by saying that he had been trying to get ahold of the officers for a while and confirmed multiple times that he wanted to talk with the officers. He also said that he had to do something "stupid" to get the attention of the police and that he was wearing the protective clothing and handcuffs due to his misbehavior.

The officer explained that before they can talk, he will need to read Rueda his rights. Shortly thereafter and before the officers had an opportunity to read Rueda his rights, Rueda interrupted to ask to use the restroom, and one of the officers left the room to find where the

5

restroom was located. After the second officer left, Rueda initiated communication with the first officer and asked if the police had found the murder weapon yet. The officer said no, and Rueda related that he could take the police to the weapon, which was outside the city. The officer stated that would be helpful. Rueda also told the officer that he wanted to report his car as being stolen and asked if McCluskey was wanted for murder. The officer said McCluskey was not wanted for murder but said the police were wanting to talk with her. Rueda told the officer that he could help the police find her and asked if he could talk to the officer now. The officer said that they needed to wait until his partner returns.

When the second officer returned, the officers took Rueda to the restroom. After the bathroom break, the first officer explained that he was going to read Rueda his rights and that the interview could begin if he decided to waive his rights. After the officer went through the first rights (the right to remain silent and the warning that anything he said could be used against him), Rueda stated that he understood each of those rights. When the officer read to Rueda his right to an attorney, the following exchange occurred:

> [Rueda]: But I don't have a lawyer. And, uh, I was trying. I wrote to them already in San Angelo that I would have liked a lawyer but it was alright because the more time you take the less there will be.
>
> [Officer]: Okay.
>
> [Rueda]: She is going to get rid of that shit man.
>
> [Officer]: Alright. So do you want to speak without a lawyer?
>
> [Rueda]: Yes.
>
> [Officer]: Okay.

6

The officer then advised Rueda about his right to the appointment of an attorney, and the officer explained that the language meant "that one will be appointed to you. But that's gonna go through the process." Rueda responded, "alright." The officer informed Rueda that he had the right to terminate the interview at any time, and Rueda said he understood. Rueda again stated that having heard these rights, he wanted to continue the interview. Rueda also stated that he was knowingly, intelligently, and voluntarily proceeding with the interview, and he initialed next to each right listed on the card the officer was reading from and signed the portion indicating that he was knowingly, intelligently, and voluntarily waiving the rights.

Next, Rueda proceeded to confirm that he was present when Quintana died but claimed McCluskey shot and killed him. Although Rueda admitted that he had a 12-gauge shotgun in his car on the night of the murder, he said the weapon was on McCluskey's side of the car. Regarding the events leading up to the shooting, Rueda related that McCluskey and he saw two men going inside a convenience store and that McCluskey said that one of the men, Quintana, disrespected her in the past and had uploaded to the internet a video of her engaging in a sexual act. Next, Rueda stated that McCluskey asked him to kill Quintana when she came back to the car after going inside the store, that McCluskey said Quintana was evil and deserved to die, that McCluskey loaded the weapon, and that McCluskey then said that she would shoot Quintana herself. Rueda told the officers that he drove out of the parking lot, pulled up to the two men, rolled his window down, and warned Quintana to be careful because McCluskey had a gun. Then Rueda related that McCluskey pointed the weapon at Quintana, asked him if he remembered her, and shot the weapon. Rueda stated that he did not know that McCluskey was going to shoot the weapon and did not think McCluskey hit Quintana because he thought he saw the two men running off. Rueda told the officers that he drove off after the shooting.

7

In this interview, Rueda stated that he learned Quintana had died when McCluskey's friend called her and told her. Next, Rueda recalled that two days later, McCluskey and he drove somewhere outside of San Angelo and threw the weapon and its ammunition out of the car window. Rueda also told the officer that McCluskey had his black Cadillac and that he wanted to report it as stolen because she would not return it. Further, Rueda offered to help the police find the weapon but suggested that they needed to look soon because he thought McCluskey might find and destroy the weapon.

During the suppression hearing, the officer who went over Rueda's rights during the third and fourth interviews testified. In his testimony, the officer explained that the Big Spring police officers conducted the first two interviews, that one of them reached out to him to tell him that Rueda wanted to talk, that the officer did not mention that Rueda had asked for an attorney in the first interview, and that had he known Rueda had asked for an attorney, he would not have talked with him. However, the officer also clarified that if a suspect asks for an attorney, he will talk with the suspect again if the suspect later communicates that he wants to talk.

Regarding the third interview, the officer testified that Rueda wanted to talk and that Rueda waived his rights orally and in writing. The officer agreed that at the beginning of the interview he told Rueda that once he was transferred from Big Spring to San Angelo, he would have to go through the process of obtaining a court-appointed attorney in San Angelo, but the officer explained that he never told Rueda how long it would take to get the appointment and, instead, told Rueda that he did not know how long it would take. Further, the officer acknowledged that later in the interview Rueda asked for a lawyer but stated that Rueda continued to talk to the officer and asked to see the evidence that the officer had. Additionally, the officer testified that he confirmed twice that Rueda wanted to continue the interview after mentioning wanting a lawyer.

8

Moreover, the officer stated that he continued asking Rueda questions and did not state to Rueda that the interview could stop right now if he wanted an attorney. But the officer explained that he did not talk Rueda into anything and that Rueda voluntarily continued the interview.

Concerning the fourth interview, the officer testified that Rueda initiated the interview and asked to talk with the officer. The officer admitted that he talked with Rueda for several minutes before he was able to read Rueda his rights again. Further, the officer stated that although Rueda mentioned having written to someone in San Angelo stating that he would like to have an attorney, Rueda did not inform the officer that he wanted an attorney at that point, and Rueda confirmed that he wanted to speak without a lawyer. Additionally, the officer testified that Rueda waived his rights and, consistent with that intent, signed the portion of the *Miranda* card stating that he was voluntarily waiving his rights. Next, the officer stated that Rueda confirmed that he wanted to speak with officers and said that he had been trying to reach them for several days.

After admitting the recordings into evidence at the suppression hearing and considering the testimony and arguments made by the parties, the trial court denied Rueda's motion to suppress as it pertained to the first interview and the fourth interview. The trial court granted the motion with respect to the second interview after concluding that Rueda did not voluntarily waive his rights prior to the interview. And the trial court denied in part and granted in part the motion with respect to the third interview by suppressing the second half of the interview after Rueda invoked his right to counsel. The trial court also issued the following findings of fact and conclusions of law pertaining to the fourth interview:

9

**State's Exhibit 4 - Interview of Defendant on 11-23-2020**

**Findings of Fact:**

. . .

4. Prior to beginning the interview, Detective Chavarria gave the Defendant the verbal and written warnings required by 38.22, Sec. 2 (a), Tex. Code Crim. Proc.;

5. The Defendant, prior to and during the making of any statement during this interview, knowingly, intelligently, and voluntarily waived the rights set out in the warnings given to him by Detective Chavarria;

**Conclusions of Law:**

6. The State has proved by clear and convincing evidence that any statement made by the Defendant during this interview was voluntary[.]

During Rueda's subsequent trial, the following witnesses testified: the woman who observed the gun shot and called 911, multiple police officers involved in the investigation, employees for the convenience store and a Walmart, McCluskey, McCluskey's mother, and the forensic pathologist who performed an autopsy on Quintana. The fourth interview summarized above was admitted into evidence and played for the jury, but none of the other interviews were.

After considering the evidence presented at trial, the jury found Rueda guilty of murder. Rueda appeals the trial court's judgment of conviction by asserting that the trial court erred by denying his motion to suppress the fourth interview.

## STANDARD OF REVIEW AND GOVERNING LAW

Appellate courts review a trial court's ruling on a motion to suppress for an abuse of discretion. *Arguellez v. State*, 409 S.W.3d 657, 662 (Tex. Crim. App. 2013). Under that standard, the record is "viewed in the light most favorable to the trial court's determination, and the judgment will be reversed only if it is arbitrary, unreasonable, or 'outside the zone of reasonable

disagreement.'" *State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (quoting *State v. Dixon*, 206 S.W.3d 587, 590 (Tex. Crim. App. 2006)). In general, appellate courts apply a bifurcated standard, *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021), in which they give almost total deference to the trial court's findings of fact and review de novo the application of the law to the facts, *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). That same deferential standard applies to the trial court's determination of historical facts, even if that determination is based on a video recording admitted into evidence at a suppression hearing. *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013); *see State v. Garcia*, 569 S.W.3d 142, 149 (Tex. Crim. App. 2018) (noting that on matters of historical fact, trial judge is in better position than appellate court to settle disputes).

Moreover, courts "consider only the evidence adduced at the suppression hearing because the ruling was based on that evidence rather than evidence introduced later" unless "the suppression issue has been consensually relitigated by the parties during trial." *Herrera v. State*, 80 S.W.3d 283, 290-91 (Tex. App.—Texarkana 2002, pet. ref'd) (op. on reh'g). In addition, a trial court's ruling on the motion will be upheld if it is correct under any theory of law applicable to the case regardless of whether the trial court based its ruling on that theory, but "a trial court's ruling will not be reversed based on a legal theory that the complaining party did not present to it." *Story*, 445 S.W.3d at 732.

The Fifth Amendment prohibits the government from compelling a criminal suspect to bear witness against himself. U.S. Const. amend. V; *Pecina v. State*, 361 S.W.3d 68, 74-75 (Tex. Crim. App. 2012). To protect that privilege, the Supreme Court established safeguards against self-incrimination in the inherently coercive atmosphere of custodial interrogations. *Pecina*, 361 S.W.3d at 75. Specifically, the Supreme Court has explained that a person who is questioned by

the police after he is "taken into custody or otherwise deprived of his freedom of action in any significant way" must first "be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* Only if the person voluntarily and intelligently waives his *Miranda* rights may his statement be introduced into evidence against him at trial. *Pecina*, 361 S.W.3d at 75. If an accused expressed "his desire to deal with the police only through counsel," he "is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981). Similar to the *Miranda* warnings listed above, article 38.22 of the Code of Criminal Procedure sets out warnings that must be provided before custodial interrogation begins as well as other requirements, *see* Tex. Code Crim. Proc. art. 38.22, and "precludes the use of statements that result from custodial interrogation absent compliance with [those] additional procedural safeguards," *Henson v. State*, 440 S.W.3d 732, 742 (Tex. App.—Austin 2013, no pet.).

Regarding the dictates of *Miranda* and article 38.22, the Court of Criminal Appeals has held that "[t]here are two facets to any inquiry" regarding the adequacy of a waiver of an accused's *Miranda* rights:

> First, the waiver must be "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception." Second the waiver must be made "with a full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it."

*Leza v. State*, 351 S.W.3d 344, 349 (Tex. Crim. App. 2011) (quoting *Ripkowski v. State*, 61 S.W.3d 378, 384 (Tex. Crim. App. 2001)).  For a waiver of a *Miranda* right to be involuntary "there must be some element of official intimidation, coercion, or deception."  *Id.*  However, a claim that a waiver of the article 38.22 statutory rights is involuntary "need not be predicated on police overreaching."  *Id.* at 352 (quoting *Oursbourn v. State*, 259 S.W.3d 159, 172 (Tex. Crim. App. 2008)).  Such a claim of involuntariness can involve police overreaching but can also involve inquiries into the accused's state of mind.  *Oursbourn*, 259 S.W.3d at 172; *see Leza*, 351 S.W.3d at 352 ("Circumstances unattributable to the police that nevertheless adversely impact an accused's ability to resist reasonable police entreaties to waive his statutory rights . . . are 'factors' in the voluntariness inquiry, though they 'are usually not enough, by themselves, to render a statement inadmissible under Article 38.22.'" (quoting *Oursbourn*, 259 S.W.3d at 173)).

The determination as to whether a statement was voluntarily made must be analyzed by examining the totality of the circumstances.  *Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991); *Delao v. State*, 235 S.W.3d 235, 239 (Tex. Crim. App. 2007); *see Joseph v. State*, 309 S.W.3d 20, 25 (Tex. Crim. App. 2010) (explaining that evaluation of whether appellant knowingly, intelligently, and voluntarily waived rights before giving statement utilizes "[t]he 'totality-of-the-circumstances approach' [that] requires the consideration of 'all the circumstances surrounding the interrogation,' including the defendant's experience, background, and conduct" (quoting *Fare v. Michael C.*, 442 U.S. 707, 725 (1979))).  "Only if the 'totality of the circumstances surrounding the interrogation' reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude" that the accused waived his rights.  *Joseph*, 309 S.W.3d at 25 (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)).  Stated differently, if it is determined that a suspect's decision to waive his rights was uncoerced, that he always knew that

13

he could request a lawyer and stand mute, and that he was aware that the State could use his statements to secure a conviction, the analysis is complete, and the waiver is valid as a matter of law. *Moran*, 475 U.S. at 422-23; *Cobb v. State*, 85 S.W.3d 258, 263 n.7 (Tex. Crim. App. 2002).

Relevant factors to consider when determining whether a statement is voluntary include: whether the defendant was advised of his constitutional rights (given *Miranda* warnings or statutory warnings); the defendant's age, intelligence level, and education; the conditions under which the defendant was questioned—i.e., length of detention, duration of questioning, environment, and access to restroom facilities and food; physical or mental impairment of the defendant, such as intoxication, illness, the influence of medication or drugs, and mental impairment or other disabilities; and whether physical punishment for the failure to provide a statement, such as the deprivation of food or sleep, was used. *Work v. State*, No. 03-18-00815-CR, 2020 WL 7776389, at *19 (Tex. App.—Austin Dec. 31, 2020, no pet.) (mem. op., not designated for publication); *see Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); *Lopez v. State*, 610 S.W.3d 487, 496-97 (Tex. Crim. App. 2020); *Oursbourn*, 259 S.W.3d at 172-73. "[A] defendant's conduct—namely, willingly talking with investigators—can demonstrate a knowing, intelligent, and voluntary waiver" of his rights. *Joseph*, 309 S.W.3d at 25 n.7.

**DISCUSSION**

When arguing on appeal that the recording of the fourth interview should have been suppressed, Rueda relies on the circumstances surrounding that interview as well as the first three. Specifically, he notes that he had been held in continuous pretrial custody during all four interviews. Regarding his first interview with the Big Spring police officers, he notes that it was hostile and that although he initially waived his rights after being read them, he quickly invoked

14

his right to counsel because of the angry way he was being questioned. Further, Rueda emphasizes that although he invoked his right to counsel, the police continued the interview and that the interview did not end until he again asked for counsel. Rueda contends that his invocation of the right to counsel was charged to all law-enforcement personnel attempting to later question him, including the police officers from San Angelo, regardless of whether the officers were personally aware of the invocation. In support of this assertion, Rueda references the testimony from the police officer at the suppression hearing suggesting that he would not have attempted to talk with Rueda if he had known that Rueda had invoked his right to counsel.

Next, Rueda notes that during the second interview, no warnings regarding his rights were given. Regarding the third interview, he acknowledges that one of the officers went over his rights; however, Rueda contends that when the right to appointed counsel was discussed, the officer incorrectly told him that he would have to wait to seek the appointment of counsel in the San Angelo case until he was transferred to a jail in Tom Green County and go through the process of obtaining counsel there. Rueda contends that informing him that he had to wait to obtain an attorney forced him to choose between talking then without an attorney or waiting until he was transferred to San Angelo and obtaining counsel. Further, he notes that during that interview, he unequivocally invoked his right to counsel, as found by the trial court, but that the officers continued to ask him questions in violation of his rights. Moreover, he notes that the third interview occurred just a few days after his first combative interview with the Big Spring police officers.

In light of the above, Rueda contends that by the time of the fourth interview, he had been subjected to "a calculated, ongoing assault on his right" to an attorney "perpetrated by detectives using deception and intentionally disregarding his constitutional rights." Further, he

15

argues that out of desperation to tell his side of the story and to stop McCluskey from destroying evidence and while believing that he could not obtain appointed counsel for the murder case until he was transferred, he reached out to the San Angelo police for another interview. Additionally, he highlights that he was wearing protective clothing and was shackled during the interview. Moreover, he emphasizes that when the officer informed him that he had the right to appointed counsel, he interrupted the officer to say that he did not have a lawyer but had written to someone in San Angelo because he "would have liked a lawyer" but that it was "alright" to continue because he was concerned that McCluskey was "gonna get rid of" the evidence.[1] Further, he contends that the officer again continued his misleading statement from the third interview suggesting he could not obtain the appointment of counsel until he was transferred by stating that he had the right to appointed counsel but would still have to go through the process of obtaining it. Although Rueda acknowledges that he told the officers that he wanted to proceed and that he was knowingly, intelligently, and voluntarily waiving his rights, he contends that he did so out of desperation and while resigned to the fact that he could not have an attorney present during the interrogation in

---

[1] On appeal, Rueda concedes that this "mention of a lawyer, his desire for one expressed in past tense and qualified by, 'but it's alright . . . ,' likely did not constitute an unambiguous request for counsel," and he does not argue that the recording should have been suppressed due to his invocation of the right to counsel and instead relies on these statements as support for his assertion that his waiver was not voluntary. *See Davis v. United States*, 512 U.S. 452, 459, 462 (1994) (explaining that accused "must unambiguously request counsel," stating that accused "must articulate his desire to have counsel present sufficiently clearly that a reasonable police officer in the circumstances would understand the statement to be a request for an attorney," and determining that statement "'Maybe I should talk to a lawyer'" was not unambiguous request for counsel); *State v. Gobert*, 275 S.W.3d 888, 892 (Tex. Crim. App. 2009) ("An ambiguous or equivocal statement with respect to counsel does not even require officers to seek clarification, much less halt their interrogation"); *Davis v. State*, 313 S.W.3d 317, 338, 341 (Tex. Crim. App. 2010) (concluding that comment "I should have an attorney" was not clear request, in part, because defendant kept talking and asking police questions).

16

Big Spring.[2]  Accordingly, Rueda contends that his purported waiver "was not made with full awareness of the nature of the rights being abandoned."

Rueda characterizes the police officers' actions in this case as part of a "strategy of subterfuge and enticement . . . to mislead and dissuade Appellant from making a clear invocation and sticking with it, while keeping him talking," and he concludes that "but for" the "strategy of deceit and misdirection," he would have invoked his right to counsel.  Further, Rueda argues that "the accumulated taint of deception . . . permeated everything about [his] reinitiation of contact

---

[2] In his brief, Rueda notes that near the end of the fourth interview, which was over an hour in length, he informed the officer that he had been appointed an attorney for the Howard County charges.  Based on this statement, Rueda asserts in his brief and in his motion for rehearing that but for the allegedly deceptive tactics used by the police, he would have seized the opportunity to have that attorney present during the fourth interview and asserts that knowledge of the appointment of counsel in the other case should have been imputed to the officers conducting the fourth interview.  However, Rueda also concedes in his motion for rehearing that no mention of this statement was made during the suppression hearing.  Additionally, that portion of the fourth interview was not played during the suppression hearing, and Rueda informed the trial court that the portions of the fourth interview "of any real import" to the suppression ruling occurred in the first ten minutes, which was significantly earlier on the recording than when the statement was made.  The officer who interviewed Rueda and testified at the suppression hearing was not questioned about and did not provide testimony regarding the statement at the end of the interview.  Further, Rueda did not discuss this statement in his motion to suppress or assert it as a basis for suppressing the recording of the fourth interview in the motion or in his arguments during the suppression hearing.  Accordingly, the arguments Rueda makes concerning a statement made at the end of the fourth interview cannot serve as a basis to reverse the trial court's ruling because a trial court's ruling on a motion to suppress may not be reversed based on a legal theory that the complaining party did not present to the trial court.  *See State v. Serna*, 644 S.W.3d 712, 720 (Tex. App.—Austin 2021, pet. ref'd); *see* Tex. R. App. P. 33.1(a) (setting out requirements for preserving issue for appellate consideration); *see also Gomez v. State*, 459 S.W.3d 651, 669 (Tex. App.—Tyler 2015, pet. ref'd) (concluding that defendant did not preserve error because his argument to trial court "at the hearing on the motion to suppress did nothing to bring the trial court's attention to the issue he now seeks to raise"); *Rothstein v. State*, 267 S.W.3d 366, 373–74 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (determining that defendant did not preserve issue for appeal where his argument did not comport with objection raised in motion to suppress or at suppression hearing); *see also State v. Story*, 445 S.W.3d 729, 732 (Tex. Crim. App. 2014) (noting that trial court's ruling on suppression motion will not be reversed on legal theory that complaining party did not present to it).

with" the police and his "purported waiver of his Miranda rights" during the fourth interview. For these reasons, Rueda contends that he did not voluntarily, knowingly, and intelligently waive his rights in the fourth interview and that, therefore, the trial court abused its discretion by denying his motion to suppress the recording of that interview.

Initially, we note that Rueda stated in the first interview that he was born in 1989, which meant that he was thirty-one years old at the time of the interviews. In addition, the interviews show that Rueda was able to understand what the officers told him and was able to articulate the information he wanted to convey to the officers. Moreover, Rueda did not appear to be intoxicated or otherwise impaired during any of the interviews. Furthermore, nothing in any of the recordings or the testimony from the suppression hearing indicates that any of the officers employed or threatened to employ any type of physical punishment to induce Rueda to speak. *See Work*, 2020 WL 7776389, at *19.

Regarding the first interview, Rueda correctly points out that the officers from Big Spring did not immediately stop the interview when he first invoked his right to an attorney; however, the officers did terminate the interview approximately one minute later following a subsequent invocation of the right to counsel. Although a portion of the interview was unquestionably hostile, that portion was about one or two minutes of the approximately eleven-minute interaction. *Cf. Lopez*, 610 S.W.3d at 497 (concluding that statement was voluntarily made in part because "[t]he complained-of interview . . . lasted only about 2 hours and 15 minutes"). During the interview, Rueda was not handcuffed, and he was told that he could stop the interview at any time. Moreover, after Rueda asked for a lawyer and after the interview stopped, Rueda was immediately taken out of the interview room. In light of the preceding, including the short duration of the continued interrogation and the officers' actions terminating the interview approximately

18

one minute after Rueda invoked the right to an attorney, we believe that the trial court could have reasonably concluded that the short delay in termination and the brief exposure to hostile questioning did not undermine Rueda's understanding of the nature of his rights that he later waived in the fourth interview or contribute to any false impression of those rights.

Turning to the second interview, the recording demonstrates that Rueda initiated the contact with the Big Spring police officer because he wanted to talk with the officer about a few topics. *See Cross v. State*, 144 S.W.3d 521, 529 (Tex. Crim. App. 2004) (noting that invocation of right to counsel insulates defendant from further *police-initiated interrogation* but that defendant may initiate communication with police following invocation of right). The interview was only one hour and twenty minutes long. *Cf. Lopez*, 610 S.W.3d at 497. As with the first interview, Rueda was not handcuffed. Rueda informed the officer that he had recently been charged with murder and had been trying to contact the San Angelo police to talk about that case, and the officer communicated that he was not involved in that case but agreed to reach out to the San Angelo Police Department and let the officers know that Rueda wanted to talk about that case.

Although the police officer did not go over Rueda's rights during this interview or ask him if he wanted to waive his rights, there is nothing illegal about questioning someone without having provided those warnings first. *See State v. Pena*, 581 S.W.3d 467, 475 (Tex. App.—Austin 2019, pet. ref'd). On the contrary, the requirement of reading someone his *Miranda* rights is a judicially imposed rule of evidence, meaning that statements taken in violation of *Miranda* are not obtained in violation of the law but simply may not be admitted at trial. *Id.* Similarly, article 38.22 sets out the statutory warnings that must be provided before custodial interrogation begins if the statement will be used as evidence at trial. *Id.* In this case, that exclusionary principle was applied, and the recording of the second interview was suppressed.

19

Furthermore, despite being given his statutory warnings five days earlier, invoking his right to counsel during the first interview, and successfully terminating that interview, Rueda did not mention wanting an attorney in the second interview or wanting to terminate the interview. Although Rueda did not make the statement until the third interview, he did relate that he was familiar with his rights because he had been read his rights in other cases. Further, the officer was the person who terminated the interview after stating that he had other work to do, and Rueda expressed a desire to talk with the officer again later. Moreover, during the second interview, the officer from Big Spring told Rueda that his "best bet" in the San Angelo case was to get an attorney. When Rueda said that he was indigent and could not pay for an attorney, the officer referenced the warning card that Rueda previously signed and explained that if he was indigent, an attorney would be appointed if he requested one. Given these circumstances, the trial court could have reasonably concluded that the events of the second interview did not undermine Rueda's understanding of his rights or his later waiver of his rights during the fourth interview.

Concerning the third interview, the beginning of the recording documents that Rueda initiated this conversation with the police. *See Cross*, 144 S.W.3d at 529; *see also Joesph*, 309 S.W.3d at 25 n.7 (noting that defendant's willingness to talk to police can demonstrate knowing, voluntary, and intelligent waiver). The interview was civil. Although one of the San Angelo officers testified in the suppression hearing that he had not been told that Rueda had invoked his right to counsel during the first interview and would not have talked with Rueda had he known Rueda had invoked his right, the officer clarified that he will talk with a suspect again after the suspect invokes his right to counsel when, as here, the suspect initiates the conversation. *See Orgeon v. Bradshaw*, 462 U.S. 1039, 1044-45 (1983) (plurality op.) (noting that law-enforcement officers may talk with suspect who asked for attorney if suspect later initiates further

20

communication about case). Further, the interview in total is approximately two hours and twenty minutes in length. *See Lopez*, 610 S.W.3d at 497.

Within a few minutes of the San Angelo police officers and Rueda entering the room, one officer states that he is going to read Rueda his rights before starting the interview, and Rueda explains that he had been read his rights in other cases. Rueda stated that he understood his rights after the officer read each one. When the officer mentioned the right to an appointed counsel and when Rueda asked how long that would take because he did not have an attorney, one of the officers did assert that Rueda would have to initiate the procedure in Tom Green County when he was transferred there. Although that may not have been correct because there are circumstances in which counsel may be appointed to a defendant arrested in another county, *see* Tex. Code Crim. Proc. art. 1.051(c-1), the officer's statement was correct in that Rueda would have to initiate the process to obtain the appointment of counsel and that the process would take time, *see id.* arts. 1.051(c) (setting out time by which appointment of counsel should be performed after request is made), 26.04(j) (specifying when appointed attorney should first communicate with defendant). Moreover, consistent with the recording, the officer testified at the suppression hearing that he never provided Rueda with any type of time estimate regarding how long the process would take and did not indicate that the process would be a lengthy one. Additionally, nothing on the recording indicates that the officer conveyed the information in an attempt to deceive Rueda regarding his ability to seek the aid of counsel or to compel him to talk; on the contrary, after discussing the possibility of Rueda needing to seek appointment of counsel in two counties, the officer emphasized that Rueda could seek the appointment of counsel and could terminate the interview at any time by stating that if Rueda "wish[ed] to seek legal counsel, you can do so and you don't have to talk to me or anything like that."

21

After the officer explained to Rueda that he could seek legal advice and could stop the interview, Rueda communicated that he wanted to continue. Once the officer continued reading Rueda his rights, Rueda stated that he understood that he could stop the interview at any time, said again that he wanted to talk with the officers, and initialed and signed the *Miranda* card. *Cf. Ashcraft v. State*, 934 S.W.2d 727, 737 (Tex. App.—Corpus Christi 1996, pet. ref'd) (noting that although "defendant's signing of a prepared statement which included pre-printed averments indicating that the signer understood his rights and freely waived them is not determinative of the question of affirmative waiver, it is significant evidence").

Rueda correctly points out that he did later invoke his right to an attorney during the third interview and that the officers did not stop the interview. For that reason, the trial court suppressed the portion of the recording following his invocation of his right to an attorney. *See Miranda*, 384 U.S. at 474 (explaining that questioning must cease when suspect invokes right to counsel). Following Rueda's invocation, the officer did continue to question Rueda and did not terminate the interview, but Rueda informed the officers twice that they could continue the interview because he had changed his mind about wanting an attorney. Even though the trial court reasonably determined that these subsequent statements expressing a desire to continue did not affect the admissibility of that portion of the recording, *see Pecina*, 361 S.W.3d at 75, the court could have reasonably inferred that those statements were indicative of Rueda's continued desire to talk with the officers while also being aware of his rights. As with the previous two interviews, the trial court could have reasonably concluded that the interactions with the police during the third interview did not undermine Rueda's understanding of his rights or affect his subsequent waiver of those rights during the fourth interview.

22

Finally, turning to the fourth interview, the interview, including a bathroom break, was only one hour and fifteen minutes long. *Cf. Lopez*, 610 S.W.3d at 497. This interview was civil in tone. Further, the recording shows that Rueda again requested to talk with the police officers from San Angelo. *See Joseph*, 309 S.W.3d at 25 n.7. In fact, Rueda stated on the recording that he had been trying to talk with the officers for some time and confirmed several times that he wanted to talk with them, and he confirms in his brief that he initiated the contact with the officers. *See Edwards*, 451 U.S. at 484-85. Although he was shackled and placed in protective clothing, Rueda explained at the start of the interview that those restrictions had been imposed on him due to his behavior before the interview. At the beginning of the interview, one of the officers informed Rueda that before he could talk with the officers, they needed to go over his rights. At that point, Rueda interrupted to ask if he could use the restroom first. One of the officers left the room to find where the restrooms were in the Big Spring police station. When that officer left, Rueda asked the remaining officer if the police had found the murder weapon yet, told the officer that he could take the police to the weapon, stated that he wanted to report his car stolen, and asked if McCluskey was wanted for murder. Although the officer made brief responses to Rueda's comments, the officer also informed Rueda that they could not proceed with the interview until the other officer returned. In addition, Rueda's statements before his waiver were not prompted by police questioning, and voluntary statements not made in response to police questioning even by someone in police custody are not the product of custodial interrogation and need not be excluded even though the person had not been informed of and waived his rights. *See Jordy v. State*, 969 S.W.2d 528, 531 (Tex. App.—Fort Worth 1998, no pet.).

When the other officer located the bathroom and returned to the interview room, the officers took Rueda to the restroom. Once the restroom break was over, the three men returned

23

to the room, and the first officer read Rueda his rights. *See Work*, 2020 WL 7776389, at *19. Rueda stated that he understood his rights, and after listening to the officer discuss his right to appointed counsel, he told the officer that he did not have a lawyer but did write to someone in San Angelo because he "would have liked a lawyer." However, he confirmed that he was "alright" with continuing the interview and that he wanted to speak without a lawyer. The officer then explained that the right to the appointment of counsel for indigent people means that a lawyer would be provided to him after "go[ing] through the process."

As set out above, Rueda argues on appeal that this "process" statement was incorrect and contributed to the problems stemming from the purportedly inaccurate statement from the third interview in which the officer related that Rueda would have to wait until he was transferred to get an attorney appointed for the San Angelo case. However, the officer did not mention in this interview any need to wait or the need to be transferred first; instead, the officer simply stated that there would be a process for appointing an attorney. Moreover, based on Rueda's statement to the officer that he did not have an attorney, the trial court could have reasonably concluded that the officer's statement that there would be a process to go through for the appointment was correct. *See* Tex. Code Crim. Proc. art. 1.051. The officer did not communicate that Rueda's ability to terminate the interview was in any way dependent on the presence of an attorney or his having initiated the process. *Cf. Waldron v. State*, No. 03-17-00065-CR, 2018 WL 700047, at *6 (Tex. App.—Austin Feb. 1, 2018, pet. ref'd) (mem. op., not designated for publication) (overruling argument that officer misinformed defendant about right to attorney and noting that officer did not indicate that defendant's ability to invoke his right to attorney "was in any way dependent on the immediate availability of his attorney").

24

Rueda responded "alright" after the officer finished explaining his right to be appointed counsel, said he understood that he had the right to terminate the interview at any time, and confirmed that he wanted to proceed with the interview without an attorney after having been read his rights and that he was choosing to do so knowingly, intelligently, and voluntarily. On the *Miranda* card, Rueda placed his initials next to where each right was listed and signed the portion of the card stating that he was knowingly, voluntarily, and intelligently waiving his rights. *See Ashcraft*, 934 S.W.2d at 737. Nothing on the recording indicated that Rueda did not understand the nature of the rights that he was waiving. *See Joseph*, 309 S.W.3d at 25; *Work*, 2020 WL 7776389, at *19. After that, Rueda told the police that he was present when Quintana was killed and went over the events leading up to and following the shooting. Rueda did not invoke his right to an attorney or otherwise seek to terminate the interview.

Given the totality of the circumstances, we conclude that the trial court did not abuse its discretion by determining that Rueda knowingly, intelligently, and voluntarily waived his rights before talking with the police during the fourth interview and, therefore, by denying his motion to suppress the recording of the fourth interview. *Cf. Lopez*, 610 S.W.3d at 497 (determining that defendant voluntarily waived his rights where interview only lasted two hours and fifteen minutes, where officers offered defendant water, and where he agreed to give statement, was *Mirandized*, waived his rights, and did not ask for attorney or seek to leave interview).

For these reasons, we overrule Rueda's sole issue on appeal.

**CONCLUSION**

Having overruled Rueda's issue on appeal, we affirm the trial court's judgment of conviction.

_____

Thomas J. Baker, Justice

Before Justices Baker, Smith, and Theofanis

Affirmed on Motion for Rehearing

Filed:   December 13, 2024

Do Not Publish